IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| QATAR INVESTMENT AND PROJECTS DEVELOPMENT HOLDING COMPANY, W.L.L., <br><br> *Plaintiff,* <br><br> v. <br><br> L'ETOILE ROYALE, INC., L'ETOILE ROYALE, LLC, and GARBIS DOGRAMACIYAN <br><br> *Defendants.* | Civil Action No. _____ <br><br> **Jury Trial Demanded** |

# COMPLAINT

Plaintiff Qatar Investment and Projects Development Holding Company, W.L.L. ("QIPCO" or "Plaintiff"), by and through counsel, for its Complaint against L'Etoile Royale, Inc. and L'Etoile Royale, LLC (collectively, "LER") and Mr. Garbis Dogramaciyan ("Mr. Dogramaciyan," and together with LER, "Defendants") hereby states and alleges, upon personal knowledge as to itself, and upon information and belief as to Defendants, as follows:

## NATURE AND BASIS OF ACTION

1. This action concerns a pair of earrings that Defendants sold to QIPCO on or about November 11, 2014 in New York, New York, which Defendants induced QIPCO to purchase on the basis of material misrepresentations and omissions made by Defendants regarding the authenticity and provenance of the earrings. Defendants' acts constitute fraud under New York law.

## THE PARTIES

2. QIPCO is a family-run investment company based in Doha, Qatar.

3. His Highness Sheikh Hamad bin Abdullah Al-Thani ("Sheikh Al-Thani") is an individual citizen of Qatar and a member of the Qatari royal family, authorized to act on behalf of QIPCO.

4. L'Etoile Royale, LLC is a New York domestic limited liability company, registered with the New York Department of State ("DOS") since 1998, with DOS ID# 2282302, and registered address for service of process in New York at 795 Fifth Avenue, New York, New York 10021.

5. L'Etoile Royale, LLC has a principal place of business at 784 Madison Avenue, New York, New York 10065.

6. L'Etoile Royale, Inc. is a New York domestic business corporation, registered with the New York DOS since 1992, with DOS ID# 1633152, and registered principal executive office at 758 Madison Avenue #6, New York, New York 10021.

7. L'Etoile Royale, Inc. has a principal place of business at 784 Madison Avenue, New York, New York 10065.

8. Mr. Dogramaciyan is listed with the New York DOS as the Chief Executive Officer of L'Etoile Royale, Inc.

9. Mr. Dogramaciyan transacts business at LER's gallery in New York, New York. Mr. Dogramaciyan has an agency relationship with LER and/or is authorized to act on behalf of LER.

10. LER operates a website, www.Letoileroyale.com, which lists LER's New York City gallery as being located at 784 Madison Avenue, New York, New York 10065. LER's website contains a section entitled "Collection," which contains pictures of jewelry.

## JURISDICTION AND VENUE

11. This is an action for fraud under New York law.

12. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because: (a) the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs; and (b) Plaintiff is a foreign entity and Defendants are domestic corporate entities and a citizen of a state within the United States of America.

13. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391. A substantial part of the events giving rise to the claims against Defendants occurred in or through this district. L'Etoile Royale, Inc. and L'Etoile Royale, LLC are New York entities, registered with the State of New York, and with principal places of business in this judicial district. Mr. Dogramaciyan is the Chief Executive Officer of L'Etoile Royale, Inc. Mr. Dogramaciyan controls, directs and/or has an agency relationship with LER, the constituent entities of which are registered and based in this judicial district. Mr. Dogramaciyan transacts business on behalf of LER within this judicial district.

14. This Court has personal jurisdiction over Defendants because Defendants transact business within New York State, including within this judicial district. Defendants also contract to supply goods or services within this judicial district and/or own, use or possess real property situated within this judicial district. A substantial portion of Defendants' action that give rise to the claims stated herein occurred within this judicial district.

## BACKGROUND FACTS

### Sale of the Earrings and Defendants' Misrepresentations and Omissions

15. On November 11, 2014, QIPCO purchased a pair of earrings from LER for $875,000 (the "Earrings"). The purchase was made by QIPCO, represented by and acting through Sheikh Al-Thani.

16. LER had acquired these Earrings directly or indirectly from a well-known auction house, for a price very substantially less than what QIPCO paid to LER for the Earrings.

17. The sale of the Earrings from LER to QIPCO was evidenced by an invoice dated November 11, 2014, drafted by Mr. Dogramaciyan (the "Invoice"). An excerpt of the relevant portions of the Invoice is attached hereto as Exhibit A.

18. The Invoice states that the Earrings are "ANTIQUE DIAMOND BALL EARINGS [*sic*] with French Assay Mark." The Invoice also states that the purchase price of the Earrings was $875,000.

19. On November 11, 2014, at LER's gallery in New York City, Mr. Dogramaciyan made certain statements to QIPCO's representative Sheikh Al-Thani regarding the age, quality, and other characteristics of the Earrings. Specifically, Mr. Dogramaciyan represented to Sheikh Al-Thani that the Earrings were authentic and vintage French earrings from the 19th Century. Mr. Dogramaciyan's comments are confirmed by the Invoice, which refers to the Earrings as "ANTIQUE" and bearing a "French Assay Mark." Ex. A.

20. Mr. Dogramaciyan's representations were made on behalf of LER and himself, and Mr. Dogramaciyan controls, directs and/or has an agency relationship with LER. As such, Mr. Dogramaciyan's representations are attributable to all Defendants.

21. The representations made by Defendants regarding the authenticity and provenance of the Earrings, as well as the statement in the Invoice that the Earrings are "ANTIQUE DIAMOND BALL EARINGS [*sic*] with French Assay Mark" were fraudulent misrepresentations and/or omissions.

22. Defendants represented to Plaintiff, both orally through the representations of Mr. Dogramaciyan, and in writing through the text of the Invoice, that the Earrings were antique and of 19th Century French origin.  These were misrepresentations, because the Earrings are neither antique nor of 19th Century French origin, as explained below.

23. Defendants' representations were made with the intention of inducing QIPCO's reliance on the representations, in order to induce QIPCO, acting through Sheikh Al-Thani, to purchase the Earrings from LER.

24. QIPCO justifiably relied on Defendants' representations regarding the authenticity and provenance of the Earrings, and QIPCO would not have purchased the Earrings from LER but for these representations.

**Plaintiff's Discovery that the Earrings are Inauthentic and Not Antique**

25. Subsequent to the purchase of the Earrings, Plaintiff has commissioned at least four experts in the field of vintage jewelry to examine the Earrings in light of Defendants' representations that the Earrings are 19th Century vintage French jewelry.  All four of the experts have concluded that the Earrings are inauthentic and not antique, as explained below.

26. The first expert, Mr. Martyn Downer, F.G.A., is a leading fine arts dealer, authority on historic jewels, and former Director and Head of Sotheby's London jewelry department.

27. Mr. Downer prepared a report, dated April 12, 2019, attached hereto as Exhibit B, in which he states his opinion that the Earrings are "not antique" but rather "of modern manufacture in an antique style using cushion-shaped diamonds recovered from antique jewels." Ex B at 1. Mr. Downer also states that "[t]he use of large rose-cut diamonds with cushion-shaped stones," as in the Earrings, "is not consistent with European jewellery designs of the 19th century," and as such Mr. Downer "would date their manufacture to the early 21st century." *Id*.

28. The second expert, Mr. Raymond Sancroft-Baker is an independent jewelry consultant, and formerly a Director and Head of Christie's jewelry department for Europe, where he worked for about thirty years.

29. Mr. Sancroft-Baker prepared a report dated April 15, 2019, attached hereto as Exhibit C, in which he states his opinion that "[w]hile the earrings give the appearance of being antique, they are, in [his] opinion, of recent manufacture" and "[t]hey are not 19th century as they purport to be." Ex. C at 1. Mr. Sancroft-Baker also states that the color of the metal of the Earrings has been "artificially induced and glue has been used in attaching the earring to the cluster." *Id*.

30. The third expert, Mr. Martin Travis is the Managing Director of Symbolic & Chase, a prominent jeweler on Bond Street in London. Mr. Travis previously worked as a jewelry specialist at Christie's.

31. Mr. Travis prepared a report dated July 10, 2019, attached hereto as Exhibit D, in which he states his opinion that the Earrings are modern and not antique. Specifically, Mr. Travis opines that the Earrings are in a style "not recorded as existing in the 19th century," and instead contain diamond cuts "only found from the mid 20th century." Ex. D at 1. Mr. Travis also notes that the Earrings "have mid 20th century sprung fittings." *Id*. In this regard,

Mr. Travis identified that, in the Earrings, "[t]he oval tops are attached to the spheres with a modern glue." *Id*. He also states that the Earrings are of "modern manufacture" because they "are far to[o] light in weight." *Id*.

32. Regarding the alleged French origin of the Earrings, Mr. Travis states that "the only marks (French Marks)" on the Earrings are found on the spring fittings that appear to date to the mid-20th century, which "does not make the earrings French in origin." *Id*.

33. The fourth expert, Dr. Jack Ogden of Striptwist Ltd., is a leading expert on the materials and technology of ancient and historic jewelry. Dr. Ogden has written and lectured widely on the subject and is an elected Fellow of the Society of Antiquaries of London. Dr. Ogden has a Gem-A Gemology Diploma and a Diploma in Art Profession Law and Ethics (both with distinction) from the Institute of Art Law. He is also the President of the Society of Jewellery Historians.

34. Dr. Ogden prepared a report dated July 18, 2019, attached hereto as Exhibit E, which details the examination of the Earrings on July 15, 2019. In the report, Dr. Ogden states that the Earring appear "to be relatively recent products paying homage to early nineteenth century styles." Ex. E at 2. Dr. Ogden's report states that "in the opinion of Striptwist Ltd, the setting appears to be a modern interpretation of an antique type, but assembled in a non-antique way." *Id*. at 3. Dr. Ogden also identifies that the Earrings include "a modern adhesive," *i.e.*, glue. *Id*. Dr. Ogden's report concludes that "[i]n the opinion of Striptwist Ltd, this examination regarding various aspects of the earrings provides reasonable grounds to believe that they are not antique." *Id*. at 4.

**Defendants' Superior Knowledge and Expertise in Vintage Jewelry**

35. Defendants possessed peculiar and superior knowledge not readily available to QIPCO, and/or hold themselves out as having such knowledge. Additionally, unlike QIPCO, at the time that Defendants sold the Earrings to QIPCO, Defendants were aware that the Earrings had been purchased from a well-known auction house at a price that was significantly lower than what QIPCO paid for the Earrings, and Defendants were aware that the auction house had estimated the value of the Earrings at an order of magnitude less than what QIPCO paid.

36. Defendants also possess, claim to possess, and/or hold themselves out as possessing expertise in the vintage jewelry field. For example, LER's website carries the following representation of LER's purported long-standing expertise in vintage jewelry:



37. Defendants knew or should have known that the Earrings were inauthentic and not of French 19th Century origin, including for the reasons identified above by the vintage

8

jewelry experts consulted by Plaintiff, which reasons were readily apparent to the experts upon examination of the Earrings, and should have been apparent to Defendants given Defendants' purported expertise in vintage jewelry. These reasons include the style of the Earrings, the use of modern glue to attach portions of the Earrings, the cut of the diamonds and metal used in the Earrings, and their relatively light weight.

38. Plaintiff lacked the expertise to determine that the Earrings were inauthentic and not vintage, and retaining an expert under the circumstances at the time and place of purchase would have been unreasonable.

39. Plaintiff could not have accessed the information underlying the inauthenticity and non-vintage nature of the Earrings through inspection prior to purchase.

40. Upon Plaintiff's discovery of the inauthenticity and misrepresented provenance of the Earrings, Plaintiff, through counsel, sent two demand letters to Defendants, dated May 14, 2019 and August 6, 2019, respectively. Copies of these letters are attached hereto as Exhibits F and G.

41. Defendants did not provide a substantive response in satisfaction of Plaintiff's demand letters. Rather, in a telephone conversation on June 4, 2019, Mr. Dogramaciyan misrepresented to Plaintiff's representative that the Earrings are "100% an old piece" and "originals." This statement constitutes a further misrepresentation regarding the authenticity and provenance of the Earrings.

42. Plaintiff's causes of action stemming from Defendants' representations and/or omissions regarding the Earrings accrued no earlier than the time and place at which Plaintiff purchased the Earrings. Additionally, Plaintiff did not discover the factual bases on which to assert the claims in this Complaint until Plaintiff had the opinions of experts in 2019.

## FIRST CLAIM
## FRAUD
## (AGAINST ALL DEFENDANTS)

43. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs of this Complaint as if set forth in full herein.

44. Defendants made material misrepresentations to Plaintiff, and omitted, concealed or suppressed material facts from Plaintiff. Specifically, Defendants represented to Plaintiff that the Earrings were authentic, vintage, and of 19th Century French origin, as explained above.

45. Defendants' misrepresentations and omissions were material, false, and misleading.

46. Defendants knew or had reason to know that the misrepresentations and omissions were false and misleading at the time they were made.

47. Defendants acted with reckless disregard to the truth or falsity of the representations made regarding the authenticity and provenance of the Earrings.

48. Defendants misrepresented, omitted, concealed and/or suppressed the facts regarding the authenticity and provenance of the Earrings with the intent to influence the actions of Plaintiff, including intending to influence Plaintiff's purchase of the Earrings.

49. Plaintiff reasonably and justifiably relied on Defendants' misrepresentations in purchasing the Earrings.

50. The Earrings purchased by Plaintiff have a value that is significantly less than Plaintiff paid for them. This is further evidenced by the fact that LER had acquired the Earrings for significantly less than what QIPCO paid for the Earrings, and the auction house that originally sold the Earrings had estimated their value at very significantly less than for QIPCO paid.

51. At the time that Plaintiff purchased the Earrings, Plaintiff was unaware of the facts misrepresented, omitted, concealed and/or suppressed by Defendants. Plaintiff would have acted differently if Plaintiff had known the true facts.

52. The facts misrepresented, omitted, concealed and/or suppressed by Defendants were peculiarly within Defendants' knowledge and not discoverable by Plaintiff through the exercise of ordinary intelligence or inspection. To the extent that Defendants' representations were statements of opinion, those opinions were not sincerely held. As such, Defendants are liable for fraud under New York law.

53. Defendants hold themselves out as having expertise in the field of rare and vintage jewelry, including through representations made on their website.

54. Defendants had superior knowledge of the information underlying Defendants' representations regarding the authenticity and provenance of the Earrings. That information was not readily accessible to Plaintiff, and Defendants knew that Plaintiff was acting on the basis of mistaken knowledge. As such, Defendants had a duty to disclose this information to Plaintiff. Defendants are liable for fraudulent concealment under New York law.

55. As a result of Defendants' fraudulent conduct, Plaintiff has suffered damages in an amount to be proven at trial, and Plaintiff is entitled to a recovery of these damages.

56. Defendants' conduct described herein constitutes gross fraudulent conduct and involves high moral culpability. Further, Defendants' acts were aimed at Plaintiff and similarly situated consumers purchasing jewelry from Defendants. By virtue of Defendants' willful, wanton, and morally culpable conduct, Plaintiff is entitled to recover punitive damages in an amount to be determined at trial.

## JURY TRIAL DEMAND

Plaintiff demand a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in its favor and grant the following relief:

A. Damages for all injuries suffered as a result of Defendants' unlawful conduct, including but not limited to compensatory damages, consisting of general and special damages, in an amount to be proven at trial;

B. An award of punitive damages;

C. Defendants' profits;

D. Enhanced damages, treble damages, reasonable attorneys' fees, and costs in prosecuting this action;

E. Injunctive relief as necessary to prohibit further wrongdoing by Defendants; and

F. Such other legal and equitable relief (including rescission as appropriate) as the interests of justice may require.

Date:  <u>November 10, 2020</u>                          Respectfully submitted,

By: <u>*/s/ Philip L. Hirschhorn*</u>

Philip L. Hirschhorn (PH3861)
Aaron L. J. Pereira (AP1984)
PANITCH SCHWARZE BELISARIO &
NADEL LLP
Two Commerce Square
2001 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103

Philip.Hirschhorn@PanitchLaw.com
Aaron.Pereira@PanitchLaw.com

*Attorneys for Plaintiff Qatar Investment and Projects Development Holding Company, W.L.L.*